**Opinion issued March 5, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00685-CV

_____

## IN THE INTEREST OF M.A.J. JR., H.A.J., AND B.D.J., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-04197J**

---

## DISSENTING OPINION

I respectfully dissent. The majority reverses the trial court's order terminating Mother's parental rights to three of her children—M.A.J. Jr. (M.A.J.), H.A.J., and B.D.J.—under Texas Family Code subsections 161.001(b)(1)(E), (N), and (O). The majority opinion does not address the sufficiency of the evidence to support termination under these predicate acts. Instead, the majority reviews only the

evidence it deems material to the trial court's finding that termination is in the best interest of the children, deems the evidence supporting that finding insufficiently "clear and convincing," reverses the trial court's order terminating Mother's parental rights, and remands the case for a new trial. It affirms the part of the trial court's order appointing the Department of Family and Protective Services (DFPS) as the children's sole managing conservator, leaving the children in the limbo of permanent foster care with the prospect of their return to a drug-addicted Mother who satisfies none of the factors designed to show her fitness as a parent.

Established law does not permit a reviewing court to ignore the evidence of predicate acts relating to the fitness of a parent to raise her children, to reweigh only those selective facts it deems pertinent to the mother's rights and the children's best interests, and to make a subjective determination on the basis that the best interest evidence is not sufficiently "clear and convincing," and, accordingly, to overturn the judgment of the trial court and remand for a new trial. Rather, established law requires that, to satisfy constitutional due process standards, the reviewing court must address both the evidence supporting the statutory predicate acts required for termination and the evidence of the children's best interests, review that evidence in the light most favorable to the trial court's ruling, and base its own ruling on the legal and factual sufficiency of the evidence to support termination under objective legal standards. Here, the evidence in favor of termination adduced at trial is

2

overwhelming. Accordingly, I respectfully dissent. I would affirm the judgment of the trial court.

## Background

Because the majority omits facts material to the trial court's determination regarding the relevant predicate acts, and, therefore, likewise material to determining the children's best interests, I have restated the record facts below.

DFPS became involved with Mother and three of her children—M.A.J., a son born in January 2015, and H.A.J. and B.D.J., twin girls born in April 2018—after receiving a referral alleging sexual abuse of M.A.J. and drug use by both parents.[1] On June 25, 2018, Child Protective Services (CPS) investigator Wanda Alamutu interviewed Mother at her home and observed the three children.

Mother told Alamutu that she was unmarried and unemployed, that she received governmental assistance, including food stamps and Medicaid for the three children, and that, although she did not receive court-ordered child support, the children's father offered financial help. Mother denied drug use. When asked about the allegation of sexual abuse, she stated that M.A.J. told her that a family friend had "touched him." She stated that she took M.A.J. to see a doctor and that she no longer allows the family friend access to him. Alamutu noted that Mother "appeared to be

---

[1]     Father did not appeal the trial court's decision to terminate his parental rights to the three children.

appropriate and cooperating with the agency." Alamutu also observed that all three children were dressed appropriately "with no visible bruises or marks" and were "bonding with their parents," and she noted no other concerns with Mother or the children.

Alamutu arranged a forensic appointment for M.A.J. Mother agreed to take him to the appointment, but she failed to do so because she did not have money for gas. Alamutu rescheduled M.A.J.'s appointment and made transportation arrangements for Mother.

On July 3, 2018, Alamutu contacted Mother to inform her that DFPS had received another referral and that, as a result, Mother needed to take a drug test.[2] Although Mother agreed to the testing, she did not follow through because the hair follicle testing required shaving the back of her hair.

On July 23, 2018, the Harris County Sheriff's Office responded to a report of injury to a child at Mother's home. The incident report stated that "[t]he location contained various scrap metal piles and junked vehicles. Rusted scrap metal and broken glass were found on the ground throughout the property. The location was found to have numerous safety hazards."

Mother told the responding officer that a 5-year-old neighbor had started a physical altercation with 3-year-old M.A.J. and that the neighbor's mother had

---

[2] There is no additional information about this referral in the appellate record.

intervened, striking M.A.J. on his face with the back of her hand and knocking him to the ground. Mother told the officer that she did not try to break up the fight because M.A.J. had not started the fight and he was winning. The neighbor's mother, who had reported the incident, had a different account of how the fight transpired. She also stated that, although she did pull her son away from the fight, she did not strike M.A.J.

The responding officer's report described M.A.J.'s injuries as "consistent with being in a fight with a larger child," including "[r]edness and swelling . . . observed around both of his eyes," "[m]inor scrapes . . . on the right side of his chin and along his forehead," and swelling to his wrists; and the report concluded that these injuries did not "match a strike from an adult." The report concluded that, "[d]ue to conflicting stories and inconsistencies in injuries, [the responding officer] found all parties involved to not be credible."

The reporting officer referred the case to DFPS due to "the violent nature of the incident and the hazardous environment in which both children lived."

The next day, July 24, 2018, Alamutu informed Mother of the new allegations. Mother stated that "children play and are going to hit each other." Alamutu also asked Mother to sign a "safety plan," stating her agreement to leave her home with the children to live with a family friend and to disallow Father further contact with the children "until he cooperates and completes drug testing." Alamutu also asked

that Mother submit to urine drug testing. Mother complied with both requests that day.

Alamutu asked M.A.J. about the allegations that his neighbor had hit him, but he did not want to speak about it. She did not notice any bruises or marks on M.A.J.'s face where Mother said the neighbor had hit him. She observed M.A.J. bonding with Mother, and she noted that he was dressed appropriately with clean clothes.

On August 6, 2018, Alamutu was informed that Mother and the children had moved to live with Mother's aunt in Goodrich, Texas, because Father was "talking to another woman" and Mother "wants the best for her children."

On August 10, 2018, the results from Mother's drug testing returned positive for high levels of methamphetamine and amphetamine and positive for marijuana. When Mother, who was then living in Livingston, Louisiana, was informed of the test results, she left Livingston, and "her whereabouts [were] unknown."

On August 21, 2018, Alamutu learned that Mother and the children were back at her home in Houston. Alamutu visited Mother and informed her that, based on her positive drug test, she was concerned about Mother's ability to provide a safe environment for the children.

The following day, August 22, 2018, DFPS filed an original petition for protection of the children, conservatorship, and termination of Mother's parental rights. The petition alleged that Mother had committed acts or omissions that

constituted predicate grounds for termination of her parental rights under Family Code section 161.001(b)(1), subsections (E), (N), and (O), and that termination of her parental rights was in the best interest of the children.

DFPS attached Alamutu's affidavit to its petition. In it, Alamutu stated that, prior to the 2018 referrals of Mother to CPS, Mother had been referred to CPS for physical neglect in May and June 2016 after M.A.J. was treated in a hospital emergency room for "bites or sores" on his buttock. The wounds were abscesses from bites that appeared to be "both new and old." Alamutu noted that Mother "did not appear to be concerned about the one-year old's condition." Mother completed Family Based Safety Services with CPS in October 2016 for the incident and DFPS's disposition of the referral was noted as "ruled out."

Alamutu's affidavit also stated that Mother had a criminal history, including a conviction for engaging in organized criminal activity in November 2015 and a conviction for burglary of a habitation in March 2016. And it stated that Mother had "current and previous drug usage," including positive drug testing results for marijuana and "high levels" of methamphetamine and amphetamine in her urine in July 2018. It also stated that Mother had refused to submit to hair follicle testing.

On that same day, August 22, 2018, the trial court issued an order of protection, and DFPS removed the children from Mother's home and placed them in a foster home.

On September 6, 2018, after the statutorily required adversary hearing, the trial court signed an order appointing DFPS temporary managing conservator of the children. The trial court also signed a separate order for Mother to submit to drug testing.

DFPS created a Family Service Plan for Mother, setting out the steps she had to take to be reunited with her children. Mother's Family Service Plan required her to obtain and maintain for more than six months stable, safe, clean housing that was free of hazards and had operational utilities such as electricity, water, and gas; to obtain and maintain stable employment; to refrain from criminal activity; to complete parenting classes; to submit to random drug screenings; to complete a substance abuse assessment and follow all recommendations; to complete a psychosocial assessment and follow all recommendations; and to participate in individual therapy and substance abuse treatment. DFPS filed Mother's Family Service Plan with the court on October 1, 2018.

In October 2018, DFPS also filed CPS specialist Gabriela Cano's status report, which recommended that DFPS continue as the children's temporary managing conservator and requested that Mother's Family Service Plan, filed contemporaneously with the status report, be made an order of the court.

In January 2019, both DFPS and Child Advocates, Inc., the children's court-appointed advocate, filed reports in anticipation of the trial court's February 2019

8

permanency hearing. DFPS, through Cano, filed a permanency report stating that Mother had been referred to DFPS in January 2016 for neglectful supervision and physical neglect of M.A.J. and in May 2016 for neglectful supervision and medical neglect of M.A.J., and noting that these referrals had been designated as "ruled out" by CPS. The report also stated that, in December 2018, Mother had been referred to DFPS for neglectful supervision of J.J., a child of Mother's who is not part of the underlying proceedings, and it noted that CPS had "ruled out" the referral. The report designated the June 2018 referral for neglectful supervision that arose from M.A.J.'s fight with his neighbor as "reason to believe" the allegations. The report described all three children who were in foster care as "happy." But it stated that DFPS's goal had changed from "family reunification" to "unrelated adoption . . . due to [Mother's] testing positive [for drugs] consistently."

Cano also noted in the report that Mother was taking parenting classes and that although she had been referred for her psychosocial and drug assessments, she had not completed the assessments. And she noted that although Mother stated that she did not have contact with Father, "family friends have informed [Cano] that [Mother] does have contact" with Father, and Mother "admitted to seeing [Father] before Christmas." Additionally, Mother had not obtained an income or stable housing, and Cano stated that "[t]here are concerns that [Mother] also might be pregnant, and she admitted to smoking [during] the month of January due to finding

9

out she has a warrant." The report also stated that Mother had tested negative for drugs twice in November, but that she had tested positive for marijuana in December.

In her January 2019 report to the trial court, Kristy Clark, the children's guardian ad litem through Child Advocates, stated that Mother had begun parenting classes but had "not completed any other services that Child Advocates is aware of at this time." Noting that Mother "has a history of substance abuse and recently admitted to Child Advocates that she used marijuana," and that she had a prior CPS history, Clark concluded that Mother was unable to care for the children's health and safety. Clark recommended that DFPS maintain temporary managing conservatorship of the children.

Clark's report also addressed the children's foster placements. After a family illness caused their original foster family to be unable to continue to care for them, the children were placed in a second foster home. While in the second foster home, all three of the children lost a significant amount of weight, and M.A.J. and H.A.J. had unexplained bruises. The children were medically evaluated for abuse and neglect. Due to concerns for their safety, the children were not returned to the second foster home; instead, they were placed in a third foster home. The twins were then evaluated by a pediatrician and referred to a hospital for a possible diagnosis of re-feeding syndrome.

The trial court held a permanency hearing in February 2019. The record indicates that Mother was not present at the hearing, after which the trial court signed an order approving and incorporating Mother's Family Service Plan and finding that Mother had "not demonstrated adequate and appropriate compliance with the service plan." The trial court also ordered Mother to submit to drug testing.

In early May 2019, DFPS and Child Advocates each filed reports in advance of the permanency hearing set at the end of the month. On behalf of DFPS, Cano filed a permanency report, stating that Mother had completed her psychosocial assessment and that she had been referred for individual counseling "to address the stress she is dealing with and her past problems with [alcohol and other drugs]." While Mother had begun her parenting classes, maintained contact with CPS, and avoided new criminal activity, she had not completed her substance abuse assessment, provided proof of income or stable housing, attended court hearings, or demonstrated the ability to place her children's needs above her own. After the last permanency report in January 2019, Mother had tested positive for marijuana in January, February, and March. Cano recommended that the children's current placement be continued and approved.

In her report for Child Advocates filed in May 2019, Clark stated that although Mother had begun parenting classes, she had not completed any other services. She also recommended that, because of Mother's "history of substance abuse," Mother

undergo further drug testing. With regard to the children's progress since being placed in foster homes, Clark stated that Child Advocates continued to monitor H.A.J. and B.D.J. in connection with the weight loss they had experienced in their second placement. She also stated that both H.A.J. and B.D.J. were developmentally delayed, with cognitive, expressive, receptive, and language delays, and that B.D.J. was reported to have "trunk issues, which caused her not to be able to sit up straight," but she noted that Child Advocates had noticed improvement in B.D.J.'s posture. Clark also stated that M.A.J.'s speech had greatly improved and that he had made "a lot of progress" at school. Clark concluded that Mother had "not resolved the reasons for [her] involvement with DFPS," and she recommended that DFPS maintain temporary managing conservatorship of the children and that they remain in their current placement.

The trial court held a permanency hearing on May 14, 2019. The record indicates that Mother was present for the hearing. Cano testified that Mother had started parenting classes and completed her psychosocial assessment but had not provided proof of housing or stable income or undergone substance abuse treatment and was still testing positive for drugs. Cano agreed that Mother "really isn't working her services at all" and that, other than a psychosocial assessment, she had not "done anything really." Cano also testified that Mother had been charged recently with "prostitution." When asked whether CPS was opposed to permitting

12

Mother supervised visits at CPS offices, Cano stated that CPS was opposed because Mother "is testing positive for drugs." Cano also stated that Mother had given her the name of a family friend as a possible placement for the children, but this family friend's home study was denied.

Clark also testified at the May 14, 2019 permanency hearing. She stated that she had visited the children at their current placement, which she described as "absolutely wonderful."

At the close of the hearing, the trial court called Mother to the bench and stated,

> Okay. So you have a limited amount of time to provide a safe and stable home environment for your children. If you're unwilling to do so or cannot do so, then your parental rights can be restricted or terminated. . . . The trial on this case is July 30th, 2019, and dismissal date is August 23rd, 2019.

Mother replied, "[Y]es, ma'am."

After the hearing, the trial court signed an order finding that Mother had "not demonstrated adequate and appropriate compliance with the service plan." The trial court also ordered Mother to submit to drug testing.

DFPS filed its final pre-termination permanency report in July 2019. In it, Cano stated that Mother had maintained contact with DFPS and that she had avoided engaging in criminal activity. Mother had not, however, provided proof of housing or income, attended all of her court hearings, or demonstrated the ability to place her

children's needs above her own. Mother had started but had not completed parenting classes. While she had completed her substance abuse assessment, she had not completed the outpatient treatment as instructed. And she had completed her psychosocial assessment, which recommended counseling "to address the stress she is dealing with and her past problems" with alcohol and drugs. The report also stated that Mother had tested positive for marijuana in January, February, and March 2019.

Trial of the case commenced on July 30, 2019. When Mother did not appear for trial, her counsel requested that the case be continued because she believed that Mother "would like to be here knowing that the goal is termination." The trial court denied Mother's counsel's request.

Before calling its witnesses, DFPS introduced and the trial court admitted Mother's Family Service Plan, the June 23, 2018 police incident report, the court's temporary orders, hearing status orders, and permanency orders in the case, and Mother's drug test results, which indicated that she had tested positive for marijuana and high levels of amphetamine and methamphetamine in July 2018, and positive for marijuana in September, November,[3] and December 2018, and in January, February, March, and May 2019, and that she had failed to appear for testing on January 3 and February 8, 2019.

---

[3]     Although Mother tested negative for all substances tested on November 8, 2018, she tested positive for marijuana again on November 28, 2018.

14

Cano testified that DFPS sought termination of Mother's parental rights under subsection 161.001(E) of the Family Code because she had engaged in conduct that endangered the physical and emotional well-being of the children, specifically, drug use and physical abuse. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Cano stated that there were positive drug test results for Mother dating back to 2016 and that Mother continued to abuse drugs. When asked about the June 2018 physical abuse referral, Cano could not recall whether Mother was the alleged perpetrator, but she agreed that the allegation was "basically a failure to protect" and that Mother had not "addressed those issues."

Cano also asked the trial court to terminate Mother's parental rights pursuant to subsection (N) because she had failed to maintain significant contact with her children after they were removed from her custody. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N). Cano stated that Mother had not regularly visited the children since their removal, and she explained that Mother's visits had been suspended at the beginning of the case because Mother would not give DFPS the location or other information regarding a fourth biological child of Mother's who lived with a cousin or a family friend. She further explained that had Mother cooperated and provided this information, she would have been able to visit M.A.J., H.A.J., and B.D.J.

Cano testified that DFPS was also seeking termination of Mother's parental rights under subsection (O) for failure to complete her court-ordered Family Service

Plan. *See id.* § 161.001(b)(1)(O). When asked about the progress Mother had made on her Family Service Plan, Cano stated that Mother had completed her psychological and substance abuse assessments but that she had not completed her outpatient treatment. She also stated that although Mother had not signed her Family Service Plan, Cano had met with Mother and Mother fully understood that her rights could be restricted or terminated if she did not successfully complete her Family Service Plan.

With regard to Father, Cano stated that she had only spoken with him once and that he stated that "he wanted the children to go back to [Mother], and that he would not show up to court because he has warrants out for his arrest and he was going to run until he got caught."

Cano further testified that the children were currently in a stable home environment and the placement was "going well," and she indicated that the adoptive parents were present in the courtroom. She also stated that the children's circumstances had "substantially improved" since DFPS's involvement and that, in her opinion, it was in their best interest that Mother's parental rights be terminated.

On cross-examination by Mother's counsel, Cano testified that Mother had attended the May 2019 permanency hearing and understood that "today was the final trial date" and that "CPS's goal was termination." She also testified that Mother had not informed her that she would not be at trial. Cano also stated that, since the May

16

2019 permanency hearing, Mother had not contacted her to complete any services, and Cano agreed with Mother's counsel that Mother had not done "anything that was required, whether it was showing up clean on a drug test or giving [Cano] locating information, so that she could visit these three children."

On cross-examination by the children's ad litem attorney, Cano testified that the children's therapeutic needs were being met in their current placement, including occupational and speech therapy for the twins and individual therapy for M.A.J., and that she had no concerns with the permanency that this foster home could provide for the children.

Clark testified that the children were doing well in their current placement, and she agreed that termination of Mother's parental rights was in the children's best interest. On cross-examination by Mother's counsel, Clark agreed that Mother "had no family members for placement." On cross-examination by the children's ad litem attorney, Clark also testified that the children had been neglected while in their second foster home. She also stated that M.A.J. "has had some trouble adjusting" and that he "needs a little bit more therapy." She asked that the court order DFPS to identify a trauma-informed therapist to assist M.A.J.'s therapeutic needs, and she stated that she was willing to remain on the case to help facilitate the children's adjustment in their current foster home.

DFPS rested and Mother did not call any witnesses to testify.

17

The trial court signed a final decree of termination of Mother's parental rights on August 21, 2019. In the decree, the trial court found that termination of the parent-child relationship was in the children's best interest and that Mother had committed predicate acts or omissions under Family Code subsections 161.001(b)(1)(E), (N), and (O).

Mother filed a motion for new trial, in which she argued that the evidence was legally and factually insufficient to support the trial court's findings. After a hearing at which Mother testified by telephone, the trial court denied the motion.

Mother filed a notice of appeal of the trial court's order terminating her parental rights to M.A.J., H.A.J., and B.D.J.

**Standard of Review**

On appeal, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate-act and best-interest findings.

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a

18

statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

In a legal sufficiency review, we look at all of the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *see In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). We must give appropriate deference to the factfinder's conclusions, which means we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but this does not mean that we must disregard all evidence that does not support the finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Disregarding undisputed facts that do not support the finding could skew our analysis of whether clear and convincing evidence exists. *In re J.F.C.*, 96 S.W.3d at 266; *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018) ("In conducting a legal-

19

sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding."). "In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. If we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven is true, we must conclude that the evidence is legally insufficient. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

When a parent challenges the factual sufficiency of the evidence supporting the trial court's findings, we review all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We should inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *see In re A.C.*, 560 S.W.3d at 631 ("In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding."). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a

firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266). In applying this standard, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d at 26); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that, despite heightened standard, we must still provide due deference to decisions of factfinder, who had full opportunity to observe witness testimony first-hand and was sole arbiter of assessing witness credibility and demeanor).

## Analysis

The majority opinion concentrates solely on whether termination of Mother's parental rights was in the children's best interest. I would first address whether DFPS presented sufficient evidence of a predicate finding, as the evidence relevant to predicate findings is also relevant to the best-interest determination.

## A. Predicate Acts

### 1. *Applicable Law*

Mother argues that the trial court erred in terminating her parental rights because the evidence was legally and factually insufficient to support the termination finding under Family Code subsections 161.001(b)(1)(E) (endangerment), (N)

21

(constructive abandonment), (O) (failure to complete requirements of court-ordered family service plan), and 161.001(b)(2) (best interests of children).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). Family Code section 161.001(b)(1)(M) provides that parental rights may be terminated if there is clear and convincing evidence that the parent has had their parent-child relationship with respect to another child terminated based on conduct in violation of section 161.001(b)(1)(D) or (E). *See id.* at 233–34 (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(M)).

When a trial court has terminated a parent's rights under subsection (D) or (E), that becomes a basis to terminate the parent's rights to other children, and that ground alone can be sufficient to support termination in a later proceeding; thus, terminating parental rights under section 161.001(b)(1)(D) and (E) has "significant" collateral consequences that can affect a parent's rights to other children. *Id.* The Texas Supreme Court has therefore held that "[w]hen a parent has presented the issue on appeal, *an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal* and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other

children." *Id.* at 235 (emphasis added). "Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights."[4] *Id.* at 237.

### 2.    *Subsection (E) Finding*

In her first issue, Mother argues that DFPS failed to produce clear and convincing evidence to support the trial court's finding under subsection (E) that she engaged in a course of conduct that endangered her children's physical or emotional well-being. DFPS responds that the undisputed evidence that Mother engaged in illegal drug use while parenting her children and continued illegal drug use even after DFPS removed the children from her care is legally and factually sufficient to support the trial court's endangerment finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). I agree with DFPS, whose argument is supported by settled law.

---

[4]    I note that the majority emphasizes the "fundamental liberty interest[]" that a parent has in "the care, custody, and control of [her] children." Slip Op. at 10–11 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, the Supreme Court emphasized in *Troxel* that this is the right of a *fit* parent. *See Troxel*, 530 U.S. at 68–69 ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

The very point of termination proceedings is to determine whether a parent is fit to exercise that fundamental liberty interest. If the court does not fully address that issue in making its determination on whether to terminate a parent's rights to a child and declares a parent fit when the evidence shows she is not, the *child*, as well as the mother, is deprived of the benefit of the inquiry required by due process.

Family Code section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See id.* Under this subsection, the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; instead, "what is required is a voluntary, deliberate, and conscious course of conduct." *Id.* This conduct does not have to occur in the presence of the child. *Id.* Courts may consider conduct that occurred before the child's birth and both before and after DFPS removed the child from the parent's home. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

"Endanger" means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but "endangering conduct need not be directed at the child." *In re E.N.C.*, 384 S.W.3d at 803; *see Jordan*, 325 S.W.3d at 723 ("[D]anger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury."); *In re J.J.S.*, 272 S.W.3d 74, 78

24

(Tex. App.—Waco 2008, pet. struck) (stating that danger to child's physical or emotional well-being may be inferred from parental misconduct). Endangerment can occur through both acts and omissions. *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.).

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. A parent's drug use and the effects of that drug use on the parent's life and ability to parent may establish an endangering course of conduct supporting termination under section 161.001(b)(1)(E). *In re J.O.A.*, 283 S.W.3d at 345; *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *see also In re B.J.*, 01-15-00886-CV, 2016 WL 1389054, at *7 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) ("[I]llegal narcotics use and its effect on an individual's ability to parent may constitute an endangering course of conduct."). Importantly, a parent's use of illegal drugs "exposes the child to the possibility that the parent may be impaired or imprisoned." *In re N.J.H.*, 575 S.W.3d at 831 (quoting *Walker*, 312 S.W.3d at 617); *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting.").

In this case, DFPS presented evidence that Mother tested positive for drugs on several occasions during the pendency of the termination proceedings. DFPS

25

presented evidence that, upon receiving the initial reports of sexual abuse by a family friend and neglectful supervision of M.A.J. in June and July 2018, it ordered Mother to submit to drug testing. DFPS introduced and the trial court admitted Mother's drug testing results, including the initial July 2018 results indicating that she tested positive for marijuana and for high levels of methamphetamine and amphetamine. After receiving these positive test results, DFPS sought temporary managing conservatorship and termination of Mother's parental rights, and the trial court ordered Mother to undergo random drug screenings. Mother's drug testing results admitted into evidence also indicate that, with the exception of one negative result for all substances tested on November 8, 2018, all of Mother's drug tests over the pendency of the termination proceedings returned positive for marijuana, including tests on samples taken in September, November, and December 2018 and January, February, March, and May 2019. Additionally, Mother failed to appear for testing on January 3 and February 8, 2019.[5] Both Cano, the children's DFPS caseworker, and Clark, the children's Child Advocates ad litem, considered Mother's ongoing drug use to be a reason why they believed Mother could not provide the children with a safe living environment. DFPS thus presented evidence that Mother had a

---

[5] Mother's failure to appear for testing may be treated as a positive result for illegal drugs. *See In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at *4 n.6 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. denied) (mem. op.); *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

26

continuing problem with substance abuse and that this problem persisted throughout the termination proceedings.

"[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 831–32 (quoting *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.)); *In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."). Thus, the undisputed evidence that Mother—in direct contravention of her Family Service Plan—continued to use drugs after the children were removed from her care further supports the trial court's endangerment finding.

Mother argues that this evidence is insufficient to show that her drug use endangered her children because she "was learning from her services and was trying to become drug free." She points out that, although she tested positive for marijuana, methamphetamine, and amphetamine at the start of the termination proceedings, she

27

"engaged in services and completed a psychological and substance abuse assessment," she "no longer use[s] methamphetamine and amphetamine," and she tested "at lower levels for marijuana" in May 2019.

Evidence that Mother was trending toward engaging in less serious or less frequent drug use does not nullify the uncontroverted evidence that she continued to test positive for marijuana throughout the termination proceedings knowing that doing so placed her relationship with her children in jeopardy. *See In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re N.J.H.*, 575 S.W.3d at 832 (holding that "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices") (quoting *In re J.O.A.*, 283 S.W.3d at 346); *see also In re T.E.G.*, No. 01-14-00051-CV, 2014 WL 1878919, at *7 (Tex. App.— Houston [1st Dist.] May 8, 2014, no pet.) (mem. op.) ("Nor was the trial court required to conclude that [mother] had adequately addressed her drug abuse issues in light of a single negative drug test.").

"Such evidence of improved conduct, especially of short-duration, does not preclude the trial court from reasonably forming a firm belief that [Mother]'s acts or omissions under Subsection (E) supported termination." *In re G.A.*, No. 01-18-

28

00395-CV, 2018 WL 5259905, at *5 (Tex. App.—Houston [1st Dist.] Oct. 23, 2018, pet. denied) (mem. op.) (rejecting mother's assertion that evidence of endangering conduct is "fatally undermined" by evidence that she had "been progressing in her therapy with her counselor" and "will eventually demonstrate that she can be protective" of her child) (citing *In re J.O.A.*, 283 S.W.3d at 346). Rather, "[e]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue." *In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *4 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) (quoting *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). Because the record in this case does not provide evidence that Mother's trend toward sobriety was "sure to continue," the trial court reasonably could have concluded that it may not. *See id.*

Mother also argues that there was no evidence that she used drugs around the children or that they were neglected or abused and that "the evidence showed that the children were well when they came into care." But "[b]ecause it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831–32 (citing *In re J.O.A.*, 283 S.W.3d at 345 and *Walker*, 312 S.W.3d at 617); *see also In re A.A.M.*, 464 S.W.3d at 426 (stating same).

Moreover, evidence in this case strengthens the trial court's conclusion that Mother endangered her children. There is evidence that Mother failed to adequately supervise and protect M.A.J. DFPS case worker Gabriela Cano testified at trial that Mother failed to protect M.A.J. from physical abuse by a neighbor. The evidence also included a report written by the officer who responded to the incident. The officer stated in his report that he found all witnesses, including Mother, not to be credible, and he concluded that M.A.J.'s injuries, including redness and swelling around his eyes, minor scrapes on his chin and forehead, and swelling to his wrists, did not appear to be caused by a strike to the face by an adult, as Mother had claimed. He also noted that Mother stated that she did not try to break up the fight because the other child had started it and M.A.J. was winning.

While on its own this additional evidence—showing that Mother failed to come to M.A.J.'s aid when he was engaged in a physical altercation with an older child—does not support an endangerment finding, it adds to the analysis by further demonstrating Mother's lack of judgment and resulting inability to adequately care for her children. *See In re N.J.H.*, 575 S.W.3d at 835 (stating that parent's "exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care" for her children) (quoting *In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.)). Taken as a whole, the uncontroverted evidence of Mother's history of drug use that

continued during the pendency of this case—particularly given her awareness of the impact it could have on her chances of being reunited with her children—together with this evidence of neglect for M.A.J.'s physical well-being and the evidence that M.A.J. was sexually abused at the age of one year, even if Mother took steps to protect him after the fact, demonstrates Mother's inability to provide adequate care for her children and supports the trial court's endangerment finding.

I would conclude that the record contains legally and factually sufficient evidence to support the trial court's conclusion that Mother engaged in conduct that endangered the children's physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.O.A.*, 283 S.W.3d at 345; *In re N.J.H.*, 575 S.W.3d at 831; *Walker*, 312 S.W.3d at 617.

I would overrule Mother's first issue. Because I would conclude that the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), there is no need to address Mother's second and third issues contesting the evidentiary sufficiency of the court's findings under subsections (N) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). I turn, therefore, to her challenge to the trial court's finding that termination was in the children's best interests.

31

**B.      Best Interests of the Children**

In her fourth issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.

*1.      Applicable Law*

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). There is a strong, but rebuttable, presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *see* TEX. FAM. CODE ANN. § 153.131(b); *Jordan*, 325 S.W.3d at 729 (noting that while it is imperative for courts to recognize constitutional underpinnings of parent-child relationship, courts must not sacrifice emotional and physical interests of child "merely to preserve that right").

In determining whether a child's parent is willing and able to provide the child with a safe environment, courts should consider factors including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) whether there is a history of substance abuse by the child's family; (6) the willingness and ability of the child's family to seek out, accept, and

complete counseling services; (7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (8) whether the child's family demonstrates adequate parenting skills. TEX. FAM. CODE ANN. § 263.307(b).

The Texas Supreme Court has also set out several non-exclusive factors that we consider when determining whether termination of parental rights is in the child's best interest, including: (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate that the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.). These considerations are not exhaustive, and it is not necessary that all of these considerations be proved "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some factors does not preclude a factfinder from reasonably forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642. Appellate

courts examine the entire record to decide what is in the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

Although proof of the predicate findings under section 161.001(b)(1) does not relieve DFPS from proving that termination is in the children's best interest, "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28. The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by [her] past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### 2. *Application of the* Holley *Factors*

In evaluating the sufficiency of the evidence to support a trial court's finding that termination of parental rights was in a child's best interest, courts consider the *Holley* factors and other relevant factors. *See Holley*, 544 S.W.2d at 371–72.

#### (a) *The children's desires*

Although DFPS did not present direct evidence concerning the desires of the children, "[w]hen children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re A.J.H.*, No. 01-18-00673-CV, 2019 WL 190091, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.)

34

(mem. op.) (quoting *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

At the time of trial, M.A.J. was four years old and H.A.J. and B.D.J. were one year old. Their young ages weigh in favor of the trial court's best-interest determination. *See* TEX. FAM. CODE ANN. § 263.307(b)(1) (considering child's age and physical and mental vulnerabilities); *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child— fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest). Here, both Cano and Clark testified that the children were doing well in their current placement.

Mother argues that this factor weighs in her favor because there was evidence that the children were bonded with her, physically well, and appropriately dressed while they were in her care and had to be removed from a previous foster home for neglect and transferred to their present home. This does not outweigh the evidence that Mother jeopardized the children's emotional and physical needs prior to and after their removal by engaging in illegal drug use, has not had the children in her custody for two years, and has failed both to take steps to visit them and to appear for trial.

I would find that this factor weighs against Mother's retention of her parental rights.

*(b)    The children's current and future physical and emotional needs*

Mother also argues that there is no evidence that the children had bonded with the family currently fostering and planning to adopt them. And she points out that Clark recommended that M.A.J. undergo intense trauma therapy for the trouble he was having adjusting to the foster home. This argument ignores the testimony of both Cano and Clark that the foster placement was good and that it was meeting the children's needs. Specifically, Cano testified that the placement was meeting the children's therapeutic needs, including occupational and speech therapy for the twins and individual therapy for M.A.J., and she stated that the children's circumstances had "substantially improved" since DFPS's involvement. Cano also testified that she had no concerns with the permanency that this home could provide, and it was in the children's best interest that Mother's parental rights be terminated. Similarly, Clark testified that the children were doing well in their current placement, and she agreed that termination of Mother's parental rights was in their best interest. Finally, a reasonable factfinder could have concluded that M.A.J.'s adjustment difficulties resulted from having been neglected in his previous foster home and were not due to problems with his current placement.

Mother argues that, because Cano and Clark testified that when they visited the children at her home they did not observe bruises or other signs of injury on them, and because they noted that the children were appropriately dressed, this factor

36

weighs against the trial court's finding that termination of her parental rights was in the children's best interest.

But there is also evidence of Mother's past conduct showing that, on at least two occasions, she failed to adequately supervise M.A.J. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (stating that past conduct is probative of future conduct when evaluating child's best interest). More specifically, both Cano's testimony and the June 23, 2018 police incident report describing the physical altercation M.A.J. had with a neighbor tend to show that Mother failed to adequately supervise and protect M.A.J.

Also, on June 25, 2018, two months after M.A.J.'s twin sisters were born, the family was referred to DFPS on allegations of sexual abuse of M.A.J. and drug use by both parents. Mother "appeared to be appropriate and cooperating with the Agency." However, she failed to keep a forensic appointment for M.A.J. Shortly after that, on July 3, 2018, the Sheriff's office responded to the report of injury to a child following M.A.J.'s fight with another child. Mother's account of the altercation was found by the responding officer to "not be credible." The condition of the premises was found to "hazardous." However, the DFPS representative who visited the next day found that M.A.J. was bonded with Mother and was appropriately dressed and clean.

On August 10, the results of Mother's drug test came back positive, but she had moved from the state to Livingston, Louisiana, with the children. When contacted there, she left Livingston. However, having learned that she had returned to Houston, DFPS visited her on August 21 and informed her that DFPS was concerned about her ability to provide a safe environment for the children. The next day, DFPS filed a petition for termination of parental rights and the children were removed from her home pursuant to a protective order. Mother did not regularly visit the children after their removal and her visits were suspended after she failed to give DFPS the location or other information regarding a fourth child of hers.

By the time of the permanency hearing in May 2019, Mother had begun taking parenting classes but had not fulfilled any other part of her service plan, and she continued to test positive for drugs. Meanwhile, after being removed from two foster homes—once because of a family illness and once because of severe abuse and neglect—the three children had been placed in a foster home that their Child Advocates volunteer described as "absolutely wonderful" and had begun receiving therapy and remedial services. Mother did not appear for trial on July 30, 2019, nor had she appeared for drug tests about six months before trial.

This evidence supports the trial court's best-interest finding by demonstrating Mother's inability to attend to her children's physical and emotional needs. I would find that this factor also weighs against Mother's retention of her parental rights.

38

*(c)* *The current and future physical danger to the children*

The evidence of Mother's past and ongoing drug use is uncontroverted. Such a pattern of illegal drug use by a parent suggests that she is "not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *In re A.C.*, 394 S.W.3d at 642; *In re E.R.W.*, 528 S.W.3d at 266 ("Mother's history of drug abuse bespeaks a course of conduct that the fact finder reasonably could conclude endangers [the child's] well-being."); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (considering whether child's family has history of substance abuse).

Furthermore, the evidence that Mother continued to use illegal drugs while this case was pending, knowing that her parental rights were in jeopardy, shows a disregard for the risk of harm to her children by jeopardizing her relationship with them. *See In re D.K.J.J.*, No. 01-18-01081-CV, 2019 WL 2455623, at *11 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.) (stating that evidence of mother's continued drug use during pendency of termination case and her failure to submit to court-ordered drug testing showed that she acted "with disregard for the risk of harm to her children by jeopardizing her relationship with them" and supported finding that termination was in children's best interest); *In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, no pet. h.) (mem. op.) ("Parental drug abuse also reflects poor

judgment and an unwillingness to prioritize a child's safety and welfare and thus may be considered in determining a child's best interest.").

This factor also weighs against Mother's retention of her parental rights.

### (d) The parental abilities of the person seeking custody

Mother argues that evidence that she engaged in services by completing "many parenting classes" and completing her psychosocial and substance abuse assessments "shows that she wanted to improve her parenting skills and was trying to become drug free." Even so, it is undisputed that Mother tested positive for marijuana consistently throughout these proceedings, including as late as May 2019. And she failed to complete her parenting classes and did not take part in court-ordered individual counseling or substance abuse treatment. Nor did she take steps to visit the children or appear for trial.

Furthermore, evidence of a recent turn-around does not necessarily make a best-interest finding in favor of termination factually insufficient. *In re J.H.G.*, 01-16-01006-CV, 2017 WL 2378141, at *9 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (stating that factfinder "is not required to ignore a history of narcotics use merely because it abates as trial approaches"). Here, both Cano, the caseworker, and Clark, the child advocate, expressed concern about Mother's ability to remain drug-free. *See In re M.G.D.*, 108 S.W.3d at 513–14 (stating that "evidence of a recent turnaround should be determinative only if it is

reasonable to conclude that rehabilitation, once begun, will surely continue"); *see also In re J.M.*, No. 01-17-00986-CV, 2018 WL 3117887, at \*6 (Tex. App.—Houston [1st Dist.] June 26, 2018, no pet.) (mem. op.) ("While [m]other may have shown some improvement regarding her drug usage, the trial court, based on [m]other's history of repeated relapses, could reasonably have concluded that she remained at risk of relapses and was still a danger to the children.") (citing *In re M.G.D.*, 108 S.W.3d at 514).

The uncontroverted evidence that Mother continued to use drugs even after her parental rights were at stake shows that she lacks the ability to place her children's well-being ahead of her desire to do drugs and that termination of her parental rights would safeguard the children from emotional and physical danger now and in the future. *See In re S.G.*, 2019 WL 1448870, at \*7. Mother's parental abilities were placed in doubt by her drug use, including during the pendency of this case to terminate her parental rights. *See In re A.C.*, 394 S.W.3d at 642 (stating that "pattern of illegal drug use suggests the mother was not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest").

There is also evidence that Mother failed to provide the children with safe living conditions. For example, after receiving a report of injury to a child at Mother's home, the responding officer noted in the incident report that there were

"numerous safety hazards" on the ground throughout the property, including "various scrap metal piles and junked vehicles . . . [and] [r]usted scrap metal and broken glass were found on the ground throughout the property." The report also noted that Mother stated that she did not try to intervene in the fight between M.A.J. and an older child because M.A.J. had not started it and he was winning. This also demonstrates Mother's lack of concern for her children. And at no point was Mother able to demonstrate that she had obtained a job, much less maintained employment, or had stable housing for the children.

I would find that this factor too weighs against Mother's retention of her parental rights.

> *(e)*     *Whether programs are available to assist Mother in promoting the best interest of the children*

The evidence shows that, for the most part, Mother did not take advantage of the programs available to her to aid her in making the changes necessary to properly care for her children. While she did complete some tasks in her Family Service Plan, she ultimately gave up her efforts to comply. Importantly, Mother never demonstrated that she had obtained employment or stable housing, and she failed to complete her parenting classes, individual therapy, and substance abuse treatment. The children's foster family, on the other hand, at the time of the permanency hearing—which Mother failed to attend—had provided a stable home and had been

42

taking the twins to occupational and speech therapy and M.A.J. to individual therapy.

Thus, this factor also weights in favor of termination of Mother's parental rights.

### (f) The plans for the child by the person seeking custody

There is no evidence that Mother has plans for meeting the children's needs. The children's foster placement, on the other hand, has demonstrated an ability to plan for and follow through with engaging services to meet the children's needs, including a stable home and occupational and speech therapy for the twins and individual therapy for M.A.J.

This factor also weights in favor of termination of Mother's parental rights.

### (g) The stability of the home

"The stability of the home has been found 'to be of paramount importance in a child's emotional and physical well-being.'" *In re D.K.J.J.*, 2019 WL 2455623, at *19. "A parent's drug use may indicate instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned." *Id.*; *see also In re A.C.*, 394 S.W.3d at 642 ("Evidence of a parent's pattern of drug use is relevant to present and future stability, especially regarding the parent's ability to provide for the children and protect them from emotional and physical danger.").

Thus, the uncontroverted evidence of Mother's drug use, including during the pendency of this case, demonstrates a risk of instability.

"Likewise, a parent's criminal history is indicative of a pattern of conduct that creates a risk of uncertainty and instability in the child's life." *In re D.K.J.J.*, 2019 WL 2455623, at *19. Accordingly, the evidence indicating that Mother was convicted of the offenses of engaging in organized criminal activity in 2015 and burglary of a habitation in 2016 also casts doubt upon Mother's ability to provide the children with a stable lifestyle. *See id.*; *see also In re O.N.H.*, 401 S.W.3d at 684 (stating that past conduct is probative of future conduct when evaluating child's best interest).

On this record, whether Mother can meet the children's financial needs or provide them with a safe or stable place to live is also uncertain, as Mother repeatedly failed to submit proof of income and stable housing as required in her Family Service Plan. *See Holley*, 544 S.W.2d at 372 (listing stability of parent's home as factor relevant to best-interest determination); *In re J.D.*, 436 S.W.3d at 121 (stating that Mother subjected child to uncertainty and instability by failing to maintain stable housing and employment during pendency of case); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[T]he need for permanence is a paramount consideration for the child's present and future physical and emotional needs.").

I would find that this factor also weighs in favor of termination of Mother's parental rights.

> *(h)   The willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time*

There is no evidence of Mother's willingness or ability to effect positive and personal changes in the children's lives within any reasonable time period. Rather, all the evidence suggests her inability to make such changes, such as her failure to maintain a stable home or to find employment.

I would find that this factor too weighs in favor of termination of Mother's parental rights.

> *(i)   The acts or omissions of the parent that may indicate that the parent-child relationship is not proper*

For the reasons discussed above—primarily among them, Mother's decision to continue to use drugs with the knowledge that doing so could cause her to lose her children and her failure to visit her children in foster care—the trial court could reasonably have concluded that the relationship between Mother and her children was not proper. Here, I defer to the trial court and would find that this factor too weighs in favor of termination of Mother's parental rights.

> *(j)   Any excuse for acts or omissions of the parent*

The evidence supports a finding that Mother has demonstrated a lack of care and concern for her children, and she has not offered an excuse for her decisions.

Accordingly, I would find that this factor, like all the others, weighs in favor of termination of Mother's parental rights.

### 3. *Summation of the Record Under Applicable Legal Standards*

In sum, the record includes uncontroverted evidence of Mother's ongoing drug use, failure to provide evidence of a safe and suitable residence, refusal to complete her Family Service Plan, and neglect of her children's physical and emotional needs, as well as evidence of her failure to visit the children and of the children's substantial positive improvement in their current foster placement from when they were in Mother's care. Viewing the evidence in the light most favorable to the trial court's finding, I would conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 345; *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (stating that parent's drug use, inability to provide stable home, and failure to comply with family service plan supports finding that termination is in child's best interest). Further, in view of the entire record, I would conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, I would hold that legally and factually sufficient

evidence supports the trial court's best-interest finding under established principles of law.

This is an unhappy case for all concerned. But while Mother is a sympathetic figure, I cannot consent to the majority's elevation of its concern for her rights as a parent over these young children's right to a *fit* mother capable of satisfying their needs and best interests under relevant legal standards. *See Troxel v. Granville*, 530 U.S. 57, 68–69 (2000). Therefore, I cannot join in the majority's holding in this case, which I consider contrary to established legal principles and violative of the best interests of the children. Instead, the majority opinion and judgment would keep the children in permanent foster care with no hope of adoption and with very little, if any, prospect of reunion with a parent who has consistently been indifferent to their circumstances to the point of not only failing consistently to act in their best interests, but also failing even to exercise her own visitation rights or to appear at trial to protect her parental rights from termination.

## Conclusion

For the foregoing reasons, I respectfully dissent. I would overrule Mother's issues on appeal under established legal precedents. And I would affirm the trial court's decree terminating Mother's parental rights to M.A.J., H.A.J., and B.D.J.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Goodman, and Countiss.

Justice Keyes, dissenting.